## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MONTANA

| | | |
|---|---|---|
| IN THE MATTER OF | ) | |
| THE EXTRADITION OF | ) | MJ 21-17-M-KLD |
| | ) | |
| AFRAH AHMED ALI | ) | |
| | ) | |
| a.k.a. | ) | |
| "AFRAH AHMED ABDI", a.k.a. | ) | |
| "TAX", a.k.a. "TAX HARD". | ) | |
| _____ | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF EXTRADITION

The Government of Canada seeks the extradition of Afrah Ahmed Ali, a.k.a.

Afrah Ahmed Abdi, a.k.a. Tax, a.k.a. Tax Hard ("Ali" or "the fugitive"), for

second degree murder contrary to section 235(1) of the Canada Criminal Code.[1]

Acting under its Treaty obligations,[2] the United States filed a complaint for the

provisional arrest of Ali with a view towards extradition, ECF No. 1, and now files

---

[1] A declaration from the U.S. Department of State, the diplomatic note from
Canada, the extradition treaty, and the formal extradition request are attached and
marked collectively as Exhibit 1.

[2] *See* Ex. 1 at Bates 5-43 (Treaty on Extradition Between the United States of
America and Canada, U.S.-Can., Dec. 3, 1971, 27 U.S.T. 983, as amended by
Protocol Amending the Extradition Treaty with Canada, U.S.-Can., Jan. 11, 1988,
S. TREATY DOC. NO. 101-17 (1990), and Second Protocol Amending the
Extradition Treaty with Canada, U.S.-Can., Jan. 12, 2001, S. TREATY DOC. NO.
107-11 (2002) (collectively referenced as the "Treaty")).

the formal extradition request submitted by the Government of Canada, *see* Exhibit 1 at 45-78. By statute, this Court must now hold an extradition hearing to determine whether the evidence included in Canada's extradition request is "sufficient to sustain the charge" for which Canada seeks extradition. 18 U.S.C. § 3184. If the Court finds Canada's evidence sufficient, it must "certify the same" to the United States Secretary of State, who, in turn, will ultimately decide whether to surrender Ali to Canada.[3] 18 U.S.C. §§ 3184, 3186.

The scope of the extradition process is limited, and Canada's extradition request is sufficient under the law. This Court's authority and jurisdiction and the Treaty's coverage of the charged offense are established. Canada, moreover, has offered probable cause to believe that Ali committed the murder in question. This Court should therefore certify Ali for extradition.

## I.    BACKGROUND

Canada's extradition request provides the following facts.

On August 21, 2020, at approximately 2:54 a.m., a 9-1-1 call was received

---

[3] After the Court has completed its "limited inquiry, the Secretary of State conducts an independent review of the case to determine whether to issue a warrant of surrender." *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 829 (11th Cir. 1993). "The Secretary exercises broad discretion and may properly consider myriad factors, including humanitarian ones, affecting both the individual defendant as well as foreign relations, which the extradition magistrate may not." *Id.*

by Saskatoon Police Service (SPS) Communications stating that a male had been shot at Aria Food and Spirits located at 210 Slimmon Road, Saskatoon, Saskatchewan. Saskatoon Police Service members, Medavie Health Services ("MHS") and the Saskatoon Fire Department responded to the scene and located a male victim, later identified as L.N., lying on the floor of this business with a gunshot wound to his right buttock.

L.N. was transported by MHS to Royal University Hospital but succumbed to his injuries and was declared deceased at 3:43 a.m. on August 21, 2020.

Patrons of the bar who had witnessed the shooting left prior to emergency services arrival. Only staff members remained on scene. The owner of Aria Food and Spirits, J.L., provided police with video surveillance that had captured the murder and the suspect responsible.

Det. Johnstone reviewed the video surveillance and it shows the following:

a. At 2:52:50 a.m. W.S. and E.M. walk to and sit at a table.

b. At 2:54:28 a.m. Afrah Ali and an unknown male approach the table where W.S. and E.M. are sitting. Afrah Ali pulls out a handgun with his right hand and grabs W.S., T.S., and L.N. walk over. E.M. gets out of his chair and walks away.

c. At 2:55:20 a.m. K.S. walks over and E.M. returns. T.F. walks over shortly after;

3

d. At 2:55:32 a.m. Aria bar owner, J.L., walks over and appears to be yelling at Afrah Ali. An unknown male wearing a blue hat, white t-shirt and black shorts walks over and says something to Afrah Ali.

e. At 2:55:51 a.m. D.M. walks over and pulls necklace off of W.S.'s neck. K.B. is standing a few feet away. An unknown native male wearing a white hat, white shirt and shorts is also nearby;

f. At 2:56:05 a.m. K.S., D.M., and the unknown male in the blue hat, white t-shirt and black shorts talk to each other. D.M. reaches his hand out to W.S. again and removes what appear to be ear buds from his neck;

g. At 2:56:19 a.m. Afrah Ali strikes W.S. in the left side of his head with the gun. Afrah Ali pushes W.S. back while still holding onto him and holding the handgun. L.N. comes up behind Afrah Ali and grabs him in a bear hug. L.N. is grabbed by the neck from behind by the unknown male in the blue hat, wearing a white t -shirt and black shorts. L.N. releases Afrah Ali.

h. At 2:56:34 a.m. an unknown black male punches L.N. in his back and in the left side of his head.

i. At 2:56:35 a.m. L.N. puts his hands up in front of him as Afrah Ali puts the gun to his head. Afrah Ali then grabs L.N. by his right bicep,

4

using his left hand. L.N. has his back to Afrah Ali with both his hands

up when Afrah Ali shoots L.N. in the right buttock. The muzzle flash

from the handgun can be seen in the video surveillance. Bar patrons

then head for the exit. J.L., D.M., E.M., K.B., T.S., and the native

male in the white t-shirt are all nearby watching when the shooting

happens. K.S. was heading for the exit.

j. At 2:56:38 a.m. Afrah Ali released his hold on L.N. who steps away,

bleeding heavily onto the floor. Afrah Ali turns and walks out of the

bar still carrying the handgun. The unknown black male follows Afrah

Ali out.

On August 21, 2020 police investigators located and seized a spent .40

calibre shell casing on the floor inside the restaurant. This is the casing believed to

belong to the bullet that passed through the victim, L.N.'s leg and ricocheted into a

flower pot. A live .40 calibre round was also located on the floor inside the Aria

and seized by police.

On August 21, 2020 in the parking lot outside the Aria a spent .40 calibre

shell casing and a spent .357 calibre shell casing were found and seized by police

investigators. The murder weapon has not been recovered.

On August 21, 2020, pathologist Dr. S.L. performed an autopsy on L.N. The

autopsy was attended by SPS Sgt. Navrot who took photographs and seized

exhibits. Dr. L. stated the cause of death as a gunshot wound of the right buttock. The gunshot wound went through the right thigh, transecting the right femoral artery and vein, leading to excessive blood loss resulting in the death of L.N.

On August 21, 2020 and September 9, 2020, J.L., the owner of Aria Food and Spirits, provided statements to SPS member Sgt. Boensch. J.L. identified the still photo of the male shooter as a patron of her establishment. She told police she knew him as "Tax." She did not identify anyone else from the video surveillance.

The surveillance video provided to the police by J.L. was of high quality and police investigators were able to obtain good quality still photos of the shooter from that video. A copy of three still photos obtained from the video are attached to Det. Johnstone's Affidavit as Exhibit "A". Exhibit 1 at Bates 65-67.

On August 21, 2020, T.P., the bartender from the Aria, was also interviewed by police. He identified one male as "Tax" and another male as "Babba." He said they came to the Aria at least five days a week. He described "Tax" as a bigger guy, who is black and who wears a black hoodie and is there "all the time." He told police neither "Tax" nor "Babba" had anything to do with what happened. T.P. described two groups of people who were in the bar during the early morning hours who were generally getting along. At close to 3:00 a.m., they started yelling at each other and a fight broke out. He said he heard a loud bang and everyone scattered. T.P. saw a male laying on the ground, bleeding. He ran to the office to

tell J.L. to call 9-1-1. He provided first aid assistance to L.N. until fire and ambulance arrived.

After viewing the surveillance video, some of the individuals in the bar were identified by Saskatoon Police Service members. W.S., E.M., T.S., and K.S. were already known to those SPS members. W.S. was interviewed in October, 2020 but was uncooperative with the police investigation. K.B. was also interviewed but refused to provide any information to police. Further witnesses have been approached by police including K.S., T.S., and T.F. and all have refused to provide statements. Police have been unable to locate E.M.

The male identified as "Tax" by witnesses (including J.L. and T.P.) was not known to Saskatoon Police Service. Sgt. Adam Gauthier of the Royal Canadian Mounted Police (R.C.M.P) Saskatoon "F" Division who knew of a male that goes by "Tax Hard" attended to the Saskatoon Police Service on August 21, 2020 at 8:30 a.m. where he viewed surveillance footage of the incident. At 8:47 a.m. after viewing the footage Sgt. Gauthier told investigators that the male on the video that shot L.N. goes by lnstagram username, "Tax Hard." Sgt. Adam Gauthier told investigators about the "Tax Hard" lnstagram account. On August 21, 2020 Investigators observed photos on that open lnstagram account and were of the opinion that they matched the male shooter in the Aria surveillance video. On August 21, 2020, the "Tax Hard" lnstagram account was downloaded by

Saskatoon Police technology crimes section investigators. Attached as Exhibit "B" to Det. Johnstone's affidavit is a copy of the photo taken from the open lnstagram account. Exhibit 1 at Bates 68.

On August 21, 2020, R.C.M.P. Sgt. Adam Gauthier also advised Major Crime investigators that the Combined Forces Special Investigation Unit (CFSEU) knew of "Tax Hard" and had an investigation involving that male.

On August 21st, 2020 at 9:20 a.m. investigators consulted with Sgt. Hicks, the Saskatoon Police Service officer in charge of CFSEU. Sgt. Hicks advised Major Crime Investigators that the male known as "Tax Hard" had been identified as Afrah Ali early in 2020. Sgt. Hicks advised that in the early months of 2020, CFSEU was involved in a firearms and drug trafficking investigation in Saskatoon. As part of that investigation open source searches of social media by R.C.M.P crime analyst S.T., led to the identification of several individuals who appeared to be involved in criminal activity in the Saskatoon area. This included a male who used the name "Tax Hard," who was a person of interest in the CFSEU firearms and drug investigation. As part of her role as a crime analyst, S.T. was in contact with Toronto Police Service to seek assistance in identifying "Tax Hard." On or about February 7, 2020, crime analyst H.W. of the Toronto Police Service advised S.T. that "Tax Hard" is known to them as Afrah Ahmed Ali (D.O.B. 1988). During the investigation of the murder of L.N., Sgt. Hicks advised SPS Major Crime

investigators that their analyst had done a background check on "Tax Hard" and had confirmed through the Toronto Police Service that "Tax Hard" is known to them Afrah Ahmed Ali (D.O.B. 1988).

Saskatoon Police Service investigators conducted a Canadian Police Information Centre (CPIC) check for Afrah Ali on August 21, 2020. That check revealed that he had prior involvement with Lethbridge Police Service. Saskatoon Police Service investigators contacted Lethbridge Police Service who provided a copy of the mugshot they had for Afrah Ali. Saskatoon Police Service investigators compared that mugshot to the male in the video and are of the opinion that the mugshot photo and the photos from the Aria video surveillance was the same male, Afrah Ali. A copy of the mugshot photo received from Lethbridge Police Service is attached as Exhibit "C" to Det. Johnstone's Affidavit. Exhibit 1 at Bates 69.

On or about August 25, 2020, as part of the on-going investigation of this case, the Saskatoon Police Service released the photo retrieved from the open lnstagram account of Tax Hard (Exhibit "B") and the photo received from Lethbridge Police Service (Exhibit "C") to the media. A copy of the two photos released to the media is attached as Exhibit "D" to Det. Johnstone's Affidavit. Exhibit 1 at Bates 70.

On or about August 26, 2020, the Saskatoon Police Service issued a BOLF (be on the lookout for) to all SPS Service members and other law enforcement

agencies across Canada for assistance in the apprehension of Afrah Ali. The BOLF contained two still photos from the surveillance video (Exhibit "A") and the mugshot photo obtained from the Lethbridge Police Service (Exhibit "C"). Attached as Exhibit "E" to Det. Johnstone's Affidavit is a copy of that BOLF. Exhibit 1 at Bates 71.

On or about October 17, 2020, the Saskatoon Police Service was contacted by M.C. regarding the photos released to the media. On October 29, 2020, M.C. gave a statement to investigators. M.C. is a Saskatoon landlord. He told police that he recognized the photo released by police as a tenant that had defaulted on his rent in September. M.C. told police he had rented an apartment suite to a female with the first name of Anisha. He did not remember her last name. She called him and stated that they were from Calgary and that her boyfriend, a music producer, would be paying the rent. M.C. met the boyfriend, who identified himself as Adan Suir. This male told M.C. that he would take over the lease after he and Anisha broke up. M.C. met with him and put his name on the lease. The rent was paid on August 1, 2020 but was not paid on September 1, 2020 and M.C. was unable to make contact with him through texting or email. On September 16, 2020 entry was made into the apartment and there was stuff in bags and the apartment looked abandoned and empty. M.C. kept his belongings there for a month. M.C. told the police that Adan Suir took over the lease in February or March, 2020. No

identification was provided- only a phone number and email address. M.C. said he met Adan Suir the first time in about February, 2020, when they met for him to sign the lease. In early October, 2020, he was on Google News and he checked the news release about the murder. He saw the picture of Adan and a second picture of Adan in the condo. He then called police. He also provided me with the phone number he used to communicate with Adan. M.C. confirmed that Adan had been evicted and that he was in possession of the suite.

On November 6, 2020, the suite was searched by Saskatoon Police Service members and photographs were taken. The photos posted to the social media account of "Tax Hard" matched the background of the suite. A strip of photos, in which Afrah Ali is one of those pictured, was located and seized from the kitchen counter of the suite.

On January 23, 2021, Afrah Ali (a.k.a. Afrah Abdi) was arrested by the U.S. Border Patrol. His photograph and fingerprints were taken by U.S. authorities. A copy of the fingerprints received from U.S. Border Patrol are attached as Exhibit "F" to Det. Johnstone's Affidavit. Exhibit 1 at Bates72-74. A copy of the photograph of Afrah Ali taken by U.S. Border Patrol is attached as Exhibit "G" to Det. Johnstone's Affidavit. Exhibit 1 at Bates 75.

The fingerprints taken by the U.S. authorities were compared to fingerprints taken from Afrah Ali and available from the Canadian Police Information Centre

(CPIC) by trained Forensic officer Sgt. Chelsea Shepherd. Sgt. Shepherd reported that the fingerprints on CPIC matched the fingerprints taken by U.S. authorities of Afrah Ali. A copy of the CPIC fingerprint record is attached as Exhibit "H" to Det. Johnstone's Affidavit. Exhibit 1 at Bates 76-78. Afrah Ali's fingerprints were provided to the Saskatoon Police Service on January 25, 2021 by United States Border Patrol Agent Steven Clark. They were compared to CPIC fingerprints belonging to Afrah Ali by Sgt. Shepherd. On January 25, 2021 Sgt. Shepherd compared the two sets of fingerprints and confirmed that they matched the fingerprints belonging to Afrah Ali.

On August 22, 2020, Justice of the Peace J.R. Whitley, in Saskatoon, Saskatchewan, Canada, issued an arrest warrant for Ali on the charge of second degree murder contrary to section 235(1) of the Canada Criminal Code. Exhibit 1 at Bates 48-49, 54-56. On February 16, 2021, Ali was arrested in Montana on the basis of Canada's request for provisional arrest with a view towards extradition. He is currently detained pending the hearing on the certification of extradition pursuant to 18 U.S.C. §§ 3181, *et seq*.

## II.    DISCUSSION

### A.    General Principles of Extradition

Extradition is primarily an executive responsibility with a specially defined role for a judicial officer, who is authorized by statute to determine whether to

certify to the Secretary of State that the submitted evidence is "sufficient to sustain the charge." 18 U.S.C. § 3184. That judicial function is carried out by conducting a hearing pursuant to 18 U.S.C. § 3184. At the hearing, the Court should consider the evidence presented on behalf of the requesting country and determine whether the legal requirements for certification, as defined in the Treaty, statutes and case law, have been established. If any evidence is offered by the fugitive, the Court rules on its admissibility. Once the evidentiary record is complete, the Court should make written findings of fact and conclusions of law as to each of the elements for certification, including separate findings for each offense as to which extradition is sought. *Shapiro v. Ferrandina*, 478 F.2d 894, 906 (2d Cir. 1973). Once the Court issues its certification, the Secretary of State then decides whether to surrender the fugitive to the requesting country.

In fulfilling its function under Section 3184, a judge should liberally construe the applicable extradition treaty in order to effectuate its purpose, namely, the surrender of fugitives to the requesting country. *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 14 (1936); *Factor v. Laubenheimer*, 290 U.S. 276, 301 (1933). Accordingly, the Treaty "should be construed more liberally than a criminal statute or the technical requirements of criminal procedure." *See Factor*, 290 U.S. at 298. The United States does not expect foreign governments to be versed in our criminal laws and procedures. *Grin v. Shine*, 187 U.S. 181, 184

13

(1902). Thus, "[f]orm is not to be insisted upon beyond the requirements of safety and justice." *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925).

**B.   The Requirements for Certification Are Satisfied**

A court must certify a fugitive as extraditable where: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable treaty is in full force and effect; (4) the crime for which surrender is requested is covered by the applicable treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each charge for which extradition is sought.  *See, e.g.*, *Manta v. Chertoff*, 518 F.3d 1134, 1140 (9th Cir. 2008); *see also In re Extradition of Sarellano*, 142 F. Supp. 3d 1182, 1185 (W.D. Okla. 2015). Each of the elements has been met in this case.

1.   This Court Has Authority Over the Proceedings

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184; Local CR Rule 59.1. Consequently, both magistrate judges and district judges may render a "certification" under Section 3184. This Court is therefore authorized to conduct the hearing in this case.

/ / /

## 2.  This Court Has Jurisdiction Over Ali

This Court has jurisdiction over a fugitive found within its jurisdictional boundaries. 18 U.S.C. § 3184 (a court "may, upon complaint made under oath, charging any person found within [its] jurisdiction, … issue [its] warrant for the apprehension of the person so charged"); *Pettit v. Walshe*, 194 U.S. 205, 219 (1904); *Grin*, 187 U.S. at 185-86. Ali was arrested near Whitefish, Montana, within the District of Montana. Therefore, this Court has jurisdiction over him.

## 3.  The Relevant Treaty Is in Full Force and Effect

Section 3184 provides for extradition in specifically defined situations, including whenever a treaty or convention for extradition is in force between the United States and the requesting State. *See* 18 U.S.C. § 3184. In this case, Tom Heinemann, Assistant Legal Adviser in the Office of the Legal Adviser for the U.S. Department of State, has provided a declaration attesting that the extradition treaty between the United States and Canada is in full force and effect. *See* Ex. 1 at Bates 1, para. 2. The Court defers to this determination of the Department of State. *See Kastnerova v. United States*, 365 F.3d 980, 986 (11th Cir. 2004) ("[E]very other Court of Appeals to consider whether a treaty has lapsed has deferred to the Executive's determination."), *cert. denied*, 541 U.S. 1090 (2004); *In re Extradition of Caro*, 283 F. Supp. 3d. 993, 1002 (D. Colo. 2017) ("When the government provides a declaration from an attorney in the Department of State attesting that the

treaty is in full force and effect, then the Court should extend deference to that determination.").

4.     The Charged Crime is Covered by the Treaty

Extradition treaties create an obligation for the United States to surrender fugitives under the circumstances defined in the treaty. Article 1 of the Treaty provides for the extradition of persons found in the requested country's territory (here, the United States) who have been charged with any of the offenses covered by Article 2 of the Treaty that are committed within the territory of the requesting country (here, Canada). Article 2 of the Treaty provides that extradition shall be granted for conduct which constitutes an offense punishable by the laws of both contracting parties by imprisonment or other form of detention for a term exceeding one year or any greater punishment.

In assessing whether the crime for which extradition is requested is covered by the Treaty, the Court will examine the description of criminal conduct provided by Canada in support of its charge and decide whether that conduct would constitute an offense that is punishable by at least one year imprisonment under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states. *See Peters v. Egnor*, 888 F.2d 713, 719 (10th Cir. 1989); *Cucuzzella v. Keliikoa*, 638 F.2d 105, 107-08 (9th Cir. 1981). A requesting country need not establish that its crimes are identical to ours. *See e.g.*, *Collins v.*

16

*Loisel*, 259 U.S. 309, 312 (1922); *Ross v. United States Marshal,* 168 F.3d 1190, 1196 (10th Cir. 1999); *United States v. Levy*, 905 F.2d 326, 328 (10th Cir. 1990); *Peters*, 888 F.2d at 719.  Further, in determining whether the conduct constitutes an extraditable offense, "a narrow and restricted construction is to be avoided . . . [and] if a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred." *Factor*, 290 U.S. at 293-94.

Canada has charged Ali with second degree murder contrary to section 235(1) of the Canada Criminal Code. Exhibit 1 at Bates 54-56. The penalty for second degree murder is life imprisonment. Exhibit 1 at Bates 51 (Canada Criminal Code § 235(1)). The State Department has found that this offense is an extraditable offense and covered by the Treaty. Exhibit 1 at Bates 1, para. 5. As with other matters concerning the interpretation of a treaty, the State Department's opinion on whether a particular crime is covered by the treaty is entitled to weight and deference. *See Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961); *Charlton v. Kelly*, 229 U.S. 447, 468 (1913).

Indeed, the conduct alleged by Canada could be charged as a homicide felony in the United States. Canada provides probable cause to believe that Ali shot the victim in the buttocks at close range with a gun, and the bullet penetrated the victim's body and "transect[ed] the right femoral artery and vein which led to

excessive blood loss resulting in death." Exhibit 1 Bates 58-63. This conduct could

be charged as murder under 18 U.S.C. § 1111, which has a maximum penalty of

death or life imprisonment.[4] It also could be charged as deliberate homicide under

Montana Code Annotated § 45–5–102(1)(a), which has a maximum penalty of life

imprisonment.[5] Accordingly, the crime for which extradition is sought is

encompassed by the Treaty.

     5.     <u>The Evidence Establishes Probable Cause that Ali Committed the Offense</u>

The standard of proof to find the evidence "sufficient to sustain the charge . .

." pursuant to Section 3184 is the familiar domestic requirement of probable cause.

To this end, the court must conclude there is probable cause to believe that the

---

[4] 18 U.S.C. 1111 provides in pertinent part

"(a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by . . . willful, deliberate, malicious, and premeditated killing; . . . is murder in the first degree. Any other murder is murder in the second degree."

(b) * * * *  Whoever is guilty of murder in the first degree shall be punished by death or by imprisonment for life; Whoever is guilty of murder in the second degree, shall be imprisoned for any term of years or for life."


[5] Mont. Code Ann. § 45-5-102(1)(a) provides that a person commits the offense of deliberate homicide if "the person purposely or knowingly causes the death of another human being[.]" Mont. Code Ann. § 45-5-102(2), the penalty provision for deliberate homicide, provides that the maximum sentence is death or life imprisonment.

crime charged by Canada was committed by the person before the court. *See e.g.*, *Avila-Ramos v. Kammerzell*, 893 F.3d 1243, 1247 (10th Cir. 2018); *In re Extradition of Sarellano*, 142 F. Supp. 3d at 1185-86. The evidence is sufficient, and probable cause is established, if a person of ordinary prudence and caution can conscientiously entertain a reasonable belief in the probable guilt of the accused. *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975).

The extradition judge's probable cause determination is "'not a finding of fact in the sense that the court has weighed the evidence and resolved disputed factual issues,'" but instead "'serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based.'" *Quinn*, 783 F.2d at 791 (quoting *Caplan v. Vokes*, 649 F.2d 1336, 1342 (9th Cir. 1981)).

Ali has been charged with second degree murder under Canada Criminal Code § 235(1). Exhibit 1 at Bates 54-56. Under the Canada Criminal Code, murder is culpable homicide, where the person who causes the death of a human being (a) means to cause the victim's death, or (b) means to cause the victim bodily harm that he knows is likely to cause the victim's death, and is reckless whether death ensues or not. Exhibit 1 at Bates 50-51 (Canada Criminal Code §§ 222, 229). Second degree murder is any murder that is not planned or deliberate. Exhibit 1 at Bates 51 (Canada Criminal Code § 231). The evidence provided by Canada in

19

support of its request for Ali's extradition establishes probable cause that Ali committed the charged offense. Specifically, the warrant and evidence collected by Canadian authorities, including witness interviews, video surveillance footage of Ali shooting the victim, and the pathologist's report, provide reason to believe Ali, upon arguing with the victim in a restaurant shot the victim, causing his death. Accordingly, the documents provided by Canada demonstrate probable cause that Ali took the victim's life by shooting him, which satisfies the elements of the charged offense.

### C.      The Documentary Evidence Submitted by Canada Is Alone Sufficient for Certification

The extradition hearing prescribed by 18 U.S.C. § 3184 is unique and limited in its nature. *See, e.g.*, *Martin*, 993 F.2d at 828. Unlike a criminal proceeding, its purpose is to decide the sufficiency of the charge under the treaty, not guilt or innocence—that is for the foreign court. *Collins v. Loisel*, 259 U.S. 309, 316 (1922); *Neely v. Henkel*, 180 U.S. 109, 123 (1901). Neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to extradition hearings. *See* Fed. R. Crim. P. 1(a)(5) (stating that "extradition and rendition of a fugitive" are not governed by rules); Fed. R. Evid. 1101(d)(3) (evidence rules are inapplicable to "miscellaneous proceedings such as . . . extradition or rendition"); *In re Chan Seong-I,* 346 F. Supp. 2d 1149, 1161 (D.N.M. 2004). Rather, "unique

rules of wide latitude govern reception of evidence" in extradition hearings. *Sayne v. Shipley*, 418 F.2d 679, 685 (5th Cir. 1969) (citation and internal quotation marks omitted). Among these rules are the following:

1. <u>Written Submissions Are Sufficient; No Live Witnesses Are Required</u>

Extradition treaties do not contemplate the introduction of live witness testimony at extradition proceedings because to do so "would defeat the whole object of the treaty." *Bingham v. Bradley*, 241 U.S. 511, 517 (1916). Thus, hearsay evidence is admissible at extradition hearings and may properly support a finding of extraditability. *See id.* (rejecting fugitive's claim that *ex parte* witness affidavits submitted in support of his extradition to Canada should not be considered because he had not had the opportunity to cross-examine those witnesses); *see also Collins*, 259 U.S. at 317; *United States v. Zanazanian*, 729 F.2d 624, 626-27 (9th Cir. 1980) (unsworn written statements may properly form the basis for extradition); *Simmons v. Braun*, 627 F.2d 635, 636 (2d Cir. 1980) (same). Accordingly, a finding of extraditability may be, and typically is, based entirely on the authenticated documentary evidence and information provided by the requesting government. *See, e.g.*, *Bovio v. United States*, 989 F.2d 255, 259-61 (7th Cir. 1993) (Swedish investigator's statement sufficient to establish probable cause); *United States v. Hidalgo*, 2011 WL 754270, at *3 (D. Utah Feb. 24, 2011) (certification of

extradition typically based entirely on documentary evidence and information provided by requesting government).

2.     Limitations on the Fugitive's Evidence

Ali's opportunity to challenge the evidence introduced against him is heavily circumscribed. He may not introduce evidence that contradicts the evidence submitted on behalf of Canada, attempt to establish an alibi, or present a defense. *See Charlton v. Kelly*, 229 U.S. 447, 461 (1913); *see also Collins*, 259 U.S. at 316. Moreover, procedural defenses are not permitted. *See Bingham*, 241 U.S. at 517; *Glucksman v. Henkel*, 221 U.S. 508, 513-14 (1911) (variance between charges pending in the foreign country and the complaint filed in federal court is not a valid defense to surrender).

Instead, a fugitive's right to controvert the evidence introduced against him is "limited to testimony which explains rather than contradicts the demanding country's proof" and that which "completely obliterates probable cause." *United States ex rel. Petrushansky v. Marasco*, 325 F.2d 562, 567 (2d Cir. 1963); *Hidalgo*, 2011 WL 754270, at *3 (citing *Mainero v. Gregg*, 164 F.3d 1199, 1207 n.7 (9th Cir. 1999)); *see also Collins*, 259 U.S. at 315-17; *Barapind v. Enomoto*, 400 F.3d 744, 749 (9th Cir. 2005) (*en banc*). This allowance of "explanatory evidence" and prohibition on "contradictory evidence" is rooted in the fact that an extradition judge may not weigh conflicting evidence and determine what to credit, "but,

22

rather, determines only whether there is competent evidence to support the belief

that the accused has committed the charged offense." *Quinn*, 783 F.2d at 815.

Issues requiring factual or credibility determinations are reserved for the courts in

the requesting country to resolve after the fugitive is extradited.

  3. <u>Matters Other Than Sufficiency of the Evidence Are Generally Left to the Secretary of State</u>

   Other than the sufficiency of the evidence, all matters that may be raised by

the fugitive as defenses to extradition are to be considered by the Secretary of

State, not by this Court. *See* 18 U.S.C. §§ 3184, 3186. In making extradition

determinations, "[t]he Secretary exercises broad discretion and may properly

consider factors affecting both the individual defendant as well as foreign

relations—factors that may be beyond the scope of the magistrate judge's review."

*Sidali v. Immigration & Naturalization Svc.*, 107 F.3d 191, 195 n.7 (3d Cir. 1997);

*see also Hurtado v. U.S. Atty. Gen.*, 401 Fed. App'x 453, 456 (11th Cir. 2010). The

Secretary takes into account humanitarian claims and applicable statutes, treaties,

or policies regarding appropriate treatment in the receiving country. *See*

*Ntakirutimana v. Reno*, 184 F.3d 419, 430 (5th Cir. 1999). This is consistent with

the long-held understanding that surrender of a fugitive to a foreign government is

"purely a national act . . . performed through the Secretary of State," within the

Executive's "powers to conduct foreign affairs." *See In re Kaine*, 55 U.S. 103, 110 (1852).

### III.  CONCLUSION

For the reasons set forth herein, the United States requests that the Court conduct a hearing, pursuant to 18 U.S.C. § 3184, to determine that the submission on behalf of Canada is sufficient to sustain the charges under the provisions of the applicable treaty and to certify the extradition of Ali for those charges to the Secretary of State for possible surrender to Canada.

Respectfully submitted this 27th day of April, 2021.

LEIF M. JOHNSON
Acting United States Attorney

/s/ Paulette L. Stewart
Assistant U. S. Attorney
Attorney for Plaintiff

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to D. Mont. LR 7.1(d)(2) and CR 47.2, the foregoing document is proportionately spaced, has a typeface of 14 points or more, and the body contains 5,624 words.

/s/ Paulette L. Stewart
Assistant U. S. Attorney
Attorney for Plaintiff
